UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

| | |
|---|---|
| ANGELA WALKER<br><br>Plaintiff,<br><br>v.<br><br>MISSOURI DEPARTMENT OF CORRECTIONS., et al.,<br><br>Defendants. | Case No. 20-cv-04251-NKL |

## ORDER

*Pro se* plaintiff Angela Walker and Defendants Missouri Department of Corrections ("MDOC") and Missouri Vocational Enterprises ("MVE") have filed cross-motions for summary judgment as to Ms. Walker's claims for violations of Title VII and the Equal Protection Act ("EPA"). Docs. 68, 71. For the reasons discussed below, Ms. Walker's motion for summary judgment is denied and Defendants' motion for summary judgment is granted in full.

### I. STANDARD

Summary judgment must be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In ruling on a motion for summary judgment, the court must draw "all justifiable inferences" in the non-moving party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

### II. BACKGROUND

Ms. Walker, an African-American woman, was employed by MVE, which Defendants

state is a subdivision of MDOC.[1]  From March 2016 to January 2019, Ms. Walker worked as an office support assistant.  From January 2019 to September 26, 2019, when her employment was terminated, Ms. Walker worked as an Executive I Order Entry Manager ("Executive I").

Ms. Walker acknowledged that, from the beginning of her tenure as Executive I, she struggled with some of her job functions, including credit rebilling and related emails and phone calls.  However, she claimed that her struggles were related in part to her still having to perform some duties from her prior job, her supervisors' expecting her alone to perform tasks that previously had been completed by more than one person, and understaffing.

In March 2019, one of Plaintiff's supervisors, Heather Tilman, expressed concern that Ms. Walker was struggling to complete her assigned tasks, and therefore requested that Ms. Walker send her daily status updates via emails.

In May 2019, Plaintiff left a voicemail for Travis Terry telling him that she was overwhelmed by the job.  Mr. Terry and Ms. Tilman expressed concern as to whether Ms. Walker had been ready to jump from the assistant position to the Executive I role—a comment that Ms.

---

[1] Ms. Walker did not submit a statement of undisputed facts, nor did she properly respond to Defendants' statement of undisputed facts.  Accordingly, the facts set forth here largely have been drawn from Defendants' statement of undisputed facts, which were supported by citations to the record.  *See* Fed. R. Civ. P. 56(c)(1) ("A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:  (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."); Fed. R. Civ. P. 56(e) (stating that where "a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion . . . [or] grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it).  Still, because Ms. Walker is *pro se*, the Court has drawn from the record itself where facts otherwise might have appeared controversial or contested.

Walker formally complained was unprofessional. (Ms. Walker did not suggest that the comment was indicative of racism or sexism.)

On August 28, 2019, Ms. Walker signed a letter of expectations that her direct supervisor at MVE, Albert Lindquist, also known as Charlie Lindquist, and Ms. Tilman presented to her that set forth deadlines for Ms. Walker to complete certain tasks, including delivery and laundry tickets, and to provide monthly status updates. Ms. Walker said she understood the expectations and would try to meet them.

Around the same time, Ms. Tilman and Mr. Lindquist learned that Ms. Walker's practice was to match the order invoice with the delivery ticket before processing them. Ms. Tilman told Ms. Walker that doing so was unnecessary and time-consuming, and that Ms. Walker should process the documents in the way that they had historically been processed. Ms. Walker insisted that the way the delivery tickets had been completed historically was against "policy." Ms. Walker cited two items at the time to support her rationale: (1) a job description for an accounting clerk; and (2) an accounts payable policy. She also claimed that the procedure that Ms. Tilman advised her to undertake was contrary to general accounting procedures, but Ms. Walker could not say where she learned them. During her deposition, Ms. Walker stated that she had learned of the general accounting procedures through internet research.

Ms. Tilman explained that the accounting clerk job description and accounts payable policy that Ms. Walker cited did not apply to the processing of delivery tickets. Nonetheless, Ms. Tilman permitted Ms. Walker to process the delivery tickets her way, on condition that Ms. Walker would meet a 48-hour expectation for processing the tickets.

Ms. Walker did not meet the 48-hour expectation. On September 11, 2019, one of Ms. Walker's subordinates complained to Mr. Lindquist that Ms. Walker had been delegating her

responsibility of completing delivery tickets within 48 hours of receipt. On September 12, 2019, Ms. Tilman and Mr. Lindquist met with Plaintiff to discuss her delegating her responsibility to complete delivery tickets within 48 hours. Ms. Walker again insisted on matching delivery tickets with invoices. Ms. Tilman gave Ms. Walker a direct order to stop confirming the delivery tickets in that way and to instead complete them as they had historically been processed. Ms. Walker refused to do so, stating that she believed such a process was against policy, though, again, she could not point to an applicable policy. Ms. Tilman warned Ms. Walker that, if she did not follow the directive, she would be written up for insubordination. Ms. Walker described the interaction as follows:

> So [Ms. Tilman] then on the 12th said that she didn't want me to get any help doing it. That she intended for me do it by myself and to do it without matching the delivery tickets to files and without reviewing. And so I said no, that's against policy and we're getting it done working together; I'm doing the most of it. And I explained to her what happened. And she's like, No. She She [*sic*] wants me to just go in and enter them and not review and not match them to the files. And I was like, You're just going to have a pile of delivery tickets everywhere and that's going to have to be matched to files and all that stuff. And she was like, So you're not going to do it. And I was like, No. And then she said -- she didn't say anything. And I was like, Well, is there anything else that this meeting is for, is there anything else you have an issue with me about. And she said that she was at a loss for words, that she couldn't believe that I was refusing to do what she asked me to do. And I was like, Okay. But I'm explaining it to you, the policy, and, I mean, it's in the accounting clerk's job description. And she was like, I -- I can't talk to you anymore. And I was like, Okay. So then I left and she didn't want to talk to me about anything else. And I think Albert Lindquist stayed behind and talked to her, but then I left because she said she didn't want to talk to me anymore.

Doc. 72-1, Walker Dep. Tr. 87:24–89:3.

Ms. Walker's refusal to follow her supervisor's directive prompted a pre-disciplinary meeting on September 16, 2019. Ms. Walker again could not point to a policy supporting her position. She said, "I don't know of any DOC policy relating to this. I only know the Accounts

Payable policy. I couldn't find one pertaining to invoicing when selling items." Ms. Walker again refused to follow Ms. Tilman's directive. Ms. Walker explained her refusal to comply with Ms. Tilman's directive as follows:

> So it wasn't that I was just saying, you know, I'm not going to do it.· I gave specific reasons about the policy.· And she was like, Well, that's accounts payable policy. That doesn't apply to you. So I'm like, Any policy I bring up, you're saying it doesn't apply. The Office of Administration that doesn't apply, just everything you say applies, and then you're not telling me what policy that matches to. If she would have said, Yes, this is how it is and this is the policy that it matches to, great. I'm good with that. And I'm like, yes, I'm following the policy. That's my mind set. I'm not worried about somebody's opinion. I'm not worried about any other thing other than the policy. So all she would have had to said was like, Okay, so this is the policy that I'm following. The policy, here it is. And you don't have to -- you don't have -- you can just invoice and you can just invoice every time for delivery, if she showed me that, I'm good. That's the policy. I may not like it, but I'll do it. But I knew that wasn't the policy and I knew you're not supposed to be allowed to just make up administrative policy on your own without going through the proper channels. And they were doing that and so that was my opinion. And it wasn't -- that's where I was coming from.

*Id.* at 94:4–95:5.

On September 26, 2019, Ms. Walker was terminated for refusal "to follow a legal directive from [her] supervisor and failure to successfully perform the duties of [her] job in violation of department policies and procedures."

Ms. Walker has cited two incidents during the course of her employment that reflected racial bias. First, Ms. Walker overheard her direct supervisor Mr. Lindquist asking another African American employee, an immigrant, why he did not speak better English. On another occasion, Ms. Walker overheard a woman, whom she suspected was her supervisor Ms. Tilman, commenting by phone (on speaker in Mr. Lindquist's office) that she could not take a certain employee seriously because he wore a cultural headdress, and Mr. Lindquist agreed, and the two laughed about it. Although Ms. Walker was not able to recall any other racially charged incidents during her

employment, she felt that her supervisors' questioning her reference to policy and general resistance to her suggestions reflected racism.

As far as sexist comments, Ms. Walker noted that Mr. Lindquist called Ms. Walker's unit at MVE "the girls." Ms. Walker acknowledged that she referred to her unit as "the ladies." Ms. Walker told Mr. Lindquist that the procedure was to address coworkers as "Mr." or "Ms." followed by their last name. Nonetheless, Mr. Lindquist insisted on continuing to call her group "girls," stating that it might make people "feel young."

On one occasion, after Ms. Walker and her female colleagues complained about "inventory issues," Lindquist sent Ms. Walker an email with the subject, "the good, the bad, the ugly of complaining." Ms. Walker acknowledged that the email did not refer to or otherwise concern gender.

Ms. Walker also alleges that the job classification system, which resulted in male salespeople being paid more money for performing, among other things, tasks she viewed as comparable, reflected sexism. In February 2019, Ms. Walker emailed her supervisor Heather Tilman an eleven-page document she had written in an attempt to have her job title and those of her staff reclassified. Ms. Walker acknowledged that the document did not raise concerns relating to race, and while Ms. Walker thought she had mentioned gender, she acknowledged that in fact the document was silent as to gender as well. In response to the document, Ms. Tilman and her own supervisor, Travis Terry, neither of whom had authority to change the job classification, provided Plaintiff with what they said was the proper form for seeking reclassification.

At one point, Ms. Walker was told not to approve her subordinates' requests for time off when certain tasks had not been completed, but she later was reprimanded for not giving her subordinates time off that they requested when the group was behind on the specified tasks.

6

Case 2:20-cv-04251-NKL   Document 80   Filed 06/06/22   Page 6 of 17

Ms. Walker alleges disparate treatment based on sex and race in pay, job classification and duties, and discipline. She alleges that she was discharged because of her race and sex and in retaliation for trying to follow policy and possibly other complaints she had lodged. In her motion for summary judgment, Plaintiff also argues that she was subjected to a hostile work environment.

### III. DISCUSSION

#### A. Ms. Walker's Hostile Work Environment Argument

Ms. Walker argues in her summary judgment motion that she was subjected to a hostile work environment. Defendants argue, however, that Ms. Walker did not plead a claim for hostile work environment, and therefore the Court should not consider her arguments regarding this claim.

The amended complaint includes only one mention of "hostile work environment," in the very last paragraph. Doc. 33, p. 24. More significantly, no circumstances amounting to a hostile work environment are alleged. *See, generally, id.* As such, despite giving the *pro se* plaintiff's complaint a liberal construction, the Court must conclude that Ms. Walker failed to allege a hostile work environment claim. Failure to allege a claim of hostile work environment is a sufficient ground to deny summary judgment on that purported claim. *See Rodgers v. City of Des Moines*, 435 F.3d 904, 909–10 (8th Cir. 2006) (holding that district court "properly refused to consider unpled allegations" where plaintiff "never sought leave to amend her complaint" to include new allegations, because even the "relatively permissive" pleading requirements in the Federal Rules "do not entitle parties to manufacture claims, which were not pled, late into the litigation for the purpose of avoiding summary judgment"); *DaPron v. Spire, Inc. Ret. Plans Comm.*, 377 F. Supp. 3d 946, 956 n.8 (E.D. Mo. 2019) (holding that "a party should not be able to seek summary judgment for himself on a new claim that has not been pled in his complaint"), *aff'd sub nom. DaPron v. Spire Missouri, Inc.*, 963 F.3d 836 (8th Cir. 2020); *Crow v. Fabian*, No. CIV. 08-3350

PJS/FLN, 2010 WL 2464865, at *18 (D. Minn. Feb. 5, 2010) (holding that "a party certainly cannot seek summary judgment for himself on a new claim that has not been pled in his complaint"), *report and recommendation adopted*, No. 08-CV-3350 PJS/FLN, 2010 WL 2301006 (D. Minn. June 4, 2010).

Even if the Court were to find that Ms. Walker properly pled a claim for hostile work environment, her claim would fail upon other grounds. First, although Defendants do not raise this issue, Ms. Walker's administrative claim did not include any complaint suggesting hostile work environment. *See* Doc. 5, p. 7. A plaintiff's failure to give notice in the administrative complaint of a hostile work environment claim is grounds for granting summary judgment to defendant. *See Jallow v. Bd. of Educ. of Minneapolis Pub. Sch.*, 10 F. App'x 387, 387 (8th Cir. 2001) (affirming district court decision granting defendant summary judgment on hostile work environmental claim, noting that "exhaustion of administrative remedies under Title VII requires plaintiff to give notice of claims in administrative complaint," and "plaintiff may seek relief [only] for any discrimination that grows out of, is like, or is reasonably related to substance of charge allegations"). Indeed, failure to exhaust administrative remedies is a subject matter jurisdiction deficiency that the Court cannot overlook, even where the defendants did not raise the issue. *See Wilkie v. Dep't of Health & Hum. Servs.*, 638 F.3d 944, 948 (8th Cir. 2011) (affirming district court's grant of motion to dismiss Title VII claim for lack of subject matter jurisdiction due to failure to exhaust administrative remedies); *Renneke v. Astrue*, 276 F. App'x 548, 549 (8th Cir. 2008) (affirming *sua sponte* dismissal for lack of subject matter jurisdiction based on failure to exhaust administrative remedies).

In any event, the facts presented cannot support a claim for hostile work environment. To establish a hostile-work-environment claim under Title VII, a plaintiff must show that "(1) she is

a member of the class of people protected by the statute, (2) she was subject to unwelcome harassment, (3) the harassment resulted from her membership in the protected class, and (4) the harassment was severe enough to affect the terms, conditions, or privileges of her employment." *Mahler v. First Dakota Title Ltd. P'ship*, 931 F.3d 799, 806 (8th Cir. 2019) (quotation marks and citation omitted). Critically, "[t]o be actionable, the conduct complained of must be extreme in nature and not merely rude or unpleasant." *Carpenter v. Con-Way Cent. Express, Inc.*, 481 F.3d 611, 618 (8th Cir. 2007) (quotation marks and citation omitted). "Allegations of a few isolated or sporadic incidents will not suffice; rather, the plaintiff must demonstrate the alleged harassment was so intimidating, offensive, or hostile that it poisoned the work environment." *Id.* (quotation marks and citation omitted).

Although Ms. Walker states that her supervisor made a few racial comments about two male coworkers, she has not alleged that any colleagues directed racial comments at her. The only sex-based comments allegedly directed at her were references to her and her female colleagues as "girls." She also complains about the subject of an email from a supervisor, "the good, the bad, and the ugly of complaining," which he sent after she and her female colleagues complained about "inventory issues," and about being given conflicting messages regarding approval of time-off for her subordinates, but she does not suggest that the email or conflicting messages reflected racism or sexism. Finally, she has complained of her supervisors' refusal to take her purportedly policy-based objections seriously, suggesting that the lack of courtesy or respect was a product of racial discrimination. However, even taken together, the statements and conduct of which Ms. Walker complains are patently insufficient to meet the very high standard for a hostile work environment claim. *See Bainbridge v. Loffredo Gardens, Inc.*, 378 F.3d 756, 759 (8th Cir. 2004) ("A hostile work environment exists when the workplace is dominated by racial slurs, but not when the

offensive conduct consists of offhand comments and isolated incidents."); *Elmahdi v. Marriott Hotel Servs.*, 339 F.3d 645, 653 (8th Cir. 2003) (finding that, under Section 1981, which is analyzed using the same standards that apply to Title VII claims, calling plaintiff "boy" and "black boy" on "a few occasions over a period of years," while offensive, did not rise to the level of a "steady barrage of opprobrious racial comment sufficient to support a hostile work environment claim"); *Kamal Al-Zubaidy v. TEK Indus.*, 406 F.3d 1030, 1039 (8th Cir. 2005) ("[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." (quotation marks and citations omitted)); *Hawkins v. Vantage Point Behavioral Health, LLC*, No. 13-5224, 2014 U.S. Dist. LEXIS 168373, at *11 (W.D. Ark. Dec. 2, 2014) (finding that facts did not "rise to the level that would constitute a hostile work environment under Title VII" where plaintiffs alleged that "on a regular basis" and "on numerous occasions," their supervising nurse made "various racially offensive comments," including referring to them as "[b]oys," saying that she "knew [they] must love fried chicken and watermelon," and remarking on their "thick, black hair"); *see also Bradley v. Widnall*, 232 F.3d 626, 631-32 (8th Cir. 2000) (finding that, while allegations that plaintiff's "supervisory duties were curtailed, that she was left out of the decision-making process, treated with disrespect, and subjected to false complaints . . . may have resulted in a frustrating work situation," they were not "so severe or pervasive as to have affected a term, condition, or privilege of her employment").

Thus, Defendants are entitled to summary judgment with respect to the hostile work environment claim.

### B. Ms. Walker's Claims of Disparate Treatment

Ms. Walker alleges disparate treatment based on race and gender in pay, job duties, and

discipline.

Where, as here, there is no "direct evidence of discrimination," the *McDonnell Douglas* framework applies to claims of discrimination under Title VII or the EPA. *Bunch v. Univ. of Ark. Bd. of Trs.*, 863 F.3d 1062, 1068 (8th Cir. 2017) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973)).[2] "To meet her burden, a plaintiff must show the following: (1) that she is a member of a protected class; (2) that she was meeting her employer's legitimate job expectations; (3) that she suffered an adverse employment action; and (4) that similarly situated employees outside the protected class were treated differently." *Fields v. Shelter Mut. Ins. Co.*, 520 F.3d 859, 864 (8th Cir. 2008). If the plaintiff makes this showing, the burden shifts to the employer to furnish "a legitimate, non-discriminatory justification for its adverse employment action." *Bunch*, 863 F.3d at 1068 (quotation marks and citation omitted). If the employer meets that burden, then the plaintiff must show that the employer's justification is merely a "pretext for discrimination." *Id.* Plaintiff may demonstrate that the justification is mere pretext by showing that the defendant's "explanation is unworthy of credence because it has no basis in fact" or that "discriminatory animus more likely motivated" the defendant. *Guimaraes v. SuperValu, Inc.*, 674 F.3d 962, 975 (8th Cir. 2012).

"A plaintiff can prove . . . that the circumstances give rise to an inference of discrimination . . . by putting forth facts that similarly situated employees, who are not [of the same race or sex], were treated differently." *Oluyole v. Yahoo!, Inc.*, No. 8:15CV27, 2017 WL 3394588, at *5 (D. Neb. Aug. 7, 2017) (quotation marks omitted, citing *Chappell v. Bilco Co.*, 675 F.3d

---

[2] Ms. Walker's claim under the EPA for pay discrimination on the basis of sex is governed by the same standards as her claim under Title VII. *Price v. N. States Power Co.*, 664 F.3d 1186, 1191 (8th Cir. 2011) ("The women's claims under the MHRA and Title VII are governed by the same standards as their EPA claim. Thus if summary judgment was proper on the women's EPA claim, it was also proper on their . . . Title VII claims.").

1110, 1118 (8th Cir. 2012)). A plaintiff might also provide evidence giving rise to an inference of discrimination in the form of proof that those who took the adverse employment action against her were biased against her. As discussed further below, Ms. Walker has not identified anyone of a different race or sex who was similarly situated but treated differently, nor has she presented any evidence suggesting that those who played a role in her discharge were biased against her.

Even accepting her assertions as true, Ms. Walker has not alleged that anyone similarly situated was paid more than she was. She points to "vocational enterprises reps" who had different duties—"traveling on the road and talking to people"—as comparators. Doc. 68, p. 5. However, she does not suggest that they were similarly situated; instead, she argues that because they performed *different* duties, specifically, because they did not enter orders or supervise people entering orders, as she did, they should not have been paid more. The fact that people with different job titles and duties were paid more than Ms. Walker does not suggest *disparate* treatment.

Ms. Walker complains that a supervisor mentioned considering reclassifying a position that Ms. Walker once held when another person occupied it, but Ms. Walker does not specify whether the reclassification happened or whether the person who occupied the position at the time was of a different race (she was a woman, so sex-based discrimination could not have been the cause). Thus, even if Ms. Walker had properly submitted proof of the supervisors' considering reclassification of the position, there is no indication that there was an adverse employment action or that the disparate treatment was based on race or sex.

Ms. Walker also argues that she was paid less for processing sales orders than were those who processed purchase orders. *Id.* Individuals performing tasks that were in any relevant respect different from those Ms. Walker performed cannot be said to have been similarly situated. *See*

*Gilmore v. AT & T*, 319 F.3d 1042, 1046 (8th Cir. 2003) ("The individuals used as comparators must have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances." (quotation marks and citation omitted)); *Fields v. Shelter Mut. Ins. Co.*, 520 F.3d 859, 864 (8th Cir. 2008) ("The test is rigorous and requires that the other employees be similarly situated in all relevant aspects before the plaintiff can introduce evidence comparing herself to the other employees."); *see also id.* ("Harris and Fields reported to different decision-makers, and when different decision-makers are involved, two decisions are rarely similarly situated in all relevant respects." (quotation marks and citation omitted)); *Vinson v. Tedders*, 844 F. App'x 211, 214 (11th Cir. 2021) ("Because Brown and Bass had different work experience, different job duties, and different job titles, they were not similarly situated in all material respects. A comparator must be so similar that she cannot reasonably be distinguished from the plaintiff.").

With respect to her claims relating to discharge, Ms. Walker has not pointed to anyone of any race or sex who was not terminated for similarly refusing to follow a supervisor's directive. *See Shirrell v. St. Francis Med. Ctr.*, 793 F.3d 881, 887–88 (8th Cir. 2015) (finding no inference of discrimination where plaintiff "identifie[d] no similarly situated co-workers who were not part of her protected class and who were treated any differently than she was," and "provide[d] no evidence that the ultimate decision maker in her discharge was biased against her").

Ms. Walker's complains that Defendants impermissibly created a "legal directive" that they demanded she follow, and that the directive was not in accord with Missouri law or regulations, but even if that were true, she has presented no evidence of racial or sex-based bias underlying the discipline or discharge. "The employment-discrimination laws have not vested in the federal courts the authority to sit as super-personnel departments reviewing the wisdom or

13

Case 2:20-cv-04251-NKL    Document 80    Filed 06/06/22    Page 13 of 17

fairness of the business judgments made by employers, except to the extent that those judgments involve intentional discrimination." *Guimaraes*, 674 F.3d at 977 (quotation marks and citation omitted). In other words, even if Ms. Walker were treated unfairly, or indeed if she had been directed in contravention of some established policy, in the absence of evidence that the treatment was motivated by her race or gender, it is not actionable. *See id.* ("Guimaraes has not presented sufficient evidence for a reasonable jury to find that Grubbs was 'targeting' Guimaraes *because of her national origin*. Examining the evidence as a whole, a reasonable jury could find that Grubbs targeted her for any of these reasons: because of a personality conflict, because Guimaraes critiqued Grubbs's management style, because Grubbs honestly did not believe Guimaraes was competent, or even because Guimaraes was trying to get a green card. However, none of these reasons violate Title VII."); *Lybarger v. McDonough*, No. 20-00601-CV-W-BP, 2021 WL 4876233, at *7 (W.D. Mo. Oct. 19, 2021) ("Even if there is evidence that [the] decision to discipline Plaintiff was harsh, that fact alone would not establish that the action was discriminatory."). In short, Ms. Walker has not presented sufficient evidence to make a *prima facie* case of disparate treatment under Title VII or the EPA.

### C. Title VII Retaliation Claims

"To establish a retaliation claim under Title VII, an employee must show that he engaged in statutorily protected conduct, that he suffered an adverse employment action, and that the protected conduct was a but-for cause of the adverse action." *Bennett v. Riceland Foods, Inc.*, 721 F.3d 546, 551 (8th Cir. 2013). The protected conduct must be in opposition to "any practice made an unlawful employment practice" under Title VII. 42 U.S.C. 2000e-3(a).

Because Ms. Walker has presented no direct evidence of retaliation, the *McDonnell Douglas* test applies. *Shirrell*, 793 F.3d at 888. Ms. Walker accordingly must show that: "(1) she

14

Case 2:20-cv-04251-NKL   Document 80   Filed 06/06/22   Page 14 of 17

engaged in protected activity, (2) she suffered an adverse employment action, and (3) a causal connection exists between the two." *Id.*

Here, there is no question that Ms. Walker suffered an adverse employment action—termination. However, the requirements of engagement in a protected activity and a causal connection between the activity and the adverse employment action are insurmountable hurdles.

Insofar as Ms. Walker suggests that her insistence on following what she believed was proper accounting policy was protected conduct that caused Defendants to retaliate against her, her claim fails as a matter of law. While Title VII protects against discrimination based on such characteristics as race or gender, it does not protect an employee's adherence to policies that have no relation to the objectives of Title VII. *See* 42 U.S.C. 2000e-3(a) ("It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by *this subchapter*, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing *under this subchapter*."). As such, Ms. Walker's argument that Defendants "have failed to validate how the directive was legal," Doc. 70, p. 5, is entirely beside the point.

In any event, even if the Court were to accept Ms. Walker's assertion that the rules that Defendants demanded she follow before they terminated her for noncompliance were invalid or in conflict with applicable policies, that by itself would not serve as evidence of retaliatory motive. *See Kidwell v. Eisenhauer*, 679 F.3d 957, 971 (7th Cir. 2012) (holding that "a technical violation of policy was insufficient to give rise to an inference of a retaliatory motive").

Insofar as Ms. Walker's position is that her protected conduct consisted of complaining about gender-based disparities in the classification system or Mr. Lindquist's calling her and her staff "girls," her claim still fails for want of a causal connection between her complaints and her

termination. "Title VII retaliation claims must be proved according to traditional principles of but-for causation," which "requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360, 133 S. Ct. 2517, 2533 (2013). Here, while Ms. Walker contests the propriety of her dismissal for failure to follow her supervisors' directives, there is undisputed evidence that she was fired at least in part because of that insubordination and failure to satisfactorily complete her job duties. As such, as a matter of law, her complaints about purported sexism were not but-for causes of her termination. *See Blomker v. Jewell*, 831 F.3d 1051, 1060 (8th Cir. 2016) (finding on motion to dismiss that, where employer was motivated at least in part by "other 'specifications' unrelated to any protected activity," the "protected activity was *not* a but-for cause of the alleged adverse action"); *Shirrell v. St. Francis Med. Ctr.*, 793 F.3d 881, 886 (8th Cir. 2015) (concluding, where "the uncontroverted evidence in the record show[ed] that [employer] terminated [employee] pursuant to hospital policy for disciplinary reasons, rather than in response to [employee]'s complaints about [offensive] remark," that "the district court did not err in granting summary judgment to [employer] on [employee]'s Title VII retaliation claim").

Furthermore, although a temporal connection between the alleged protected activity and the retaliatory act by itself is not sufficient to establish causation, want of a temporal connection can signify lack of causation. Here, the space of seven months between Ms. Walker's February 2019 request for reclassification and her September 2019 termination precludes a finding of any causal connection between those two events. *See Kipp v. Missouri Highway & Transp. Comm'n.*, 280 F.3d 893, 897–98 (8th Cir. 2002) ("[T]he interval of two months between the complaint and Ms. Kipp's termination so dilutes any inference of causation that we are constrained to hold as a matter of law that the temporal connection could not justify a finding in Ms. Kipp's favor on the

matter of causal link."). With regard to Mr. Lindquist's references to those in Ms. Walker's unit as "girls," Ms. Walker has not provided any timeframe at all for her complaint to Mr. Lindquist. As Ms. Walker bears the burden of making her *prima facie* case, her failure to establish a temporal connection between her complaint and the allegedly retaliatory action dooms her claim.

Ms. Walker also has not suggested that anyone similarly positioned who did not engage in protected activity was not terminated, as she was. *See Humphrey v. Dresser-Rand Co.*, No. 12-0032 JCH, 2013 WL 4805804, at *10 (E.D. Mo. Sept. 9, 2013) (granting summary judgment to defendant on Title VII retaliation claim where, *inter alia*, "there exist[ed] no evidence that similarly situated employees who did not complain of harassment or discrimination were treated better").

Given the lack of evidence of a causal connection between Ms. Walker's purported complaints about sex discrimination and her discharge, Defendants are entitled to summary judgment on the retaliation claim.

## IV. CONCLUSION

For the reasons discussed above, Ms. Walker's motion for summary judgment, Doc. 68, is DENIED and Defendants' motion for summary judgment, Doc. 71, is GRANTED in full.

s/ Nanette K. Laughrey  
NANETTE K. LAUGHREY  
United States District Judge

Dated: June 6, 2022  
Jefferson City, Missouri